CYRUS J. HOOD v. FREDERICK H. OLIN, SURVIVOR OF HIMSELF AND EMMOR WARE, COMPOSING THE FIRM OF WARE & OLIN.

*Logging contract—Agreement to furnish teams—Retention of title until paid for—Application of credits—Replevin—Demand —Witness—Facts equally within knowledge of deceased person.*

The law questions involved in this case are so intimately connected with the facts stated in the opinion, that to formulate them necessitates abstracting the opinion, which is not deemed desirable.   The catch-words at the head of this note will give a key to points decided.

Error to Mecosta.   (Fuller, J.)   Argued October 25 and 26, 1887.   Decided January 12, 1888.

Replevin.   Defendant brings error.   Reversed.   The facts are stated in the opinion.

*Stone & Hyde*, for appellant.

*Frank Dumon*, for plaintiff.

SHERWOOD, C. J.   This an ac'ion of replevin for a span of horses and yoke of oxen.

The plaintiff is a mortgagee of E. M. Nead, and brings the suit against Olin, who is the surviving partner of the firm of Ware & Olin, formerly doing a lumber business in this State.

Ware, before he died, made a contract with Nead, on the twenty-fifth day of May, 1885, by the terms of which Nead agreed to cut and deliver, near the shingle-mill on Pickerel lake, all the white pine and Norway timber situate on the north half of section 24, town 16 north, of R. 9 west, and was to have therefor the following prices:   For making star shingles, 60 cents per M., and 40 cents for others; and for logs cut into lumber, $2 50 per M., if better than mill culls; and was to be paid between the fifth and tenth of each month. Nead was to sort the logs as directed by Ware, and securely boom the logs, when delivered, in the lake near the mill, and was to begin the job in June, 1885, and complete it within a year, and keep the mill fully stocked until December after making the contract.   Ware was to become security for or furnish two teams, a span of horses and a yoke of oxen, and was to own them until paid for by Nead.   He was also to pay to Nead the necessary expenses for feed, hay, and groceries, until Nead should commence making the shingles, not to exceed $300; the same to be repaid to Ware within two months after the manufacture of shingles was commenced.

Ware, however, was to be the judge of the necessity of such advances.   Nead was to commence the erection of his camps at once, and commence putting in logs in June, and was to cut and skid logs in the fall, so they could be put in in the winter, and was to have not to exceed 75 cents per M. therefor, which was to be advanced by Ware, as also the expenses.

in putting them on the lake in winter, not to exceed (including the money paid) two-thirds of the amount they would come to at the prices herein first mentioned ; and Nead was to furnish logs to the shingle-mill so that it could run constantly after July 15 until it was shut down for winter.

It is in consequence of the failure of Nead to perform this contract upon his part that the defendant claims to be entitled to the property replevied in this case.

Nead began operations under the contract about the month of June, after which the defendant claims that Ware & Olin advanced supplies and materials to Nead, to the amount of $6,278.45, and that Ware furnished the teams as agreed, but that the firm of Ware & Olin had nothing to do with furnishing them.

Defendant further claims that Nead never completed the job; that in February, 1886, he mortgaged the teams to plaintiff, and abandoned·the job; that, during the summer and fall of 1885, there were manufactured of lumber and shingles the amount of $1,864 17, and when the mill shut down on November 1, 1885, there had been advanced to Nead, besides the teams, $2,825.40; and that Nead never manufactured any more lumber or shingles ; that, when Nead quit, Ware & Olin had allowed to him, including the $470 paid for teams, $6,748.45; and that under the agreement all the advances made prior to shutting down the mill in the fall were to be repaid within two months; that none of such advances have ever been repaid; and that before they should have been paid and credited to Nead, the next spring, he had abandoned the work, and to complete it Ware & Olin had been obliged to pay others $3,563.72; that, giving Nead credit for all the lumber and shingles taken from the land, his credits would amount to only $4,637.33.

The defendant further claims, that, upon a true statement of the account, Nead 'owes Ware & Olin $1,591.12, besides the money Ware paid for the teams, and that, under these

circumstances, Nead gave the mortgage under which the plaintiff claims to be the owner of the property in this case since the ninth day of February, 1886. This is the claim of the defendant, and his theory.

It appears that, when the dealings commenced between the parties to the contract, Ware & Olin opened an account on their books with Nead, charging him with all advances, including the teams, and that statements of these advances were from time to time sent to Nead; and the plaintiff claims that on the third day of November, 1885, Nead and Ware & Olin had a settlement, and it was found that Nead was indebted to Ware & Olin about $100.

That Nead quit putting in logs in February, 1886, at the request of Ware & Olin, and at that time Nead had paid Ware & Olin, by putting in saw and shingle logs under the contract, for all the advances he had received, and that they were really indebted to him in the sum of $679.11; that, at the time the teams were furnished to Nead, Ware & Olin had advanced only about $2,011; and that, inasmuch as Ware & Olin admitted that Nead was entitled to a credit for logs put in under the contract to the amount of $4,598.33, the credit should be given upon the earlier items advanced, and that this would pay for the teams in question, and place the title thereto in Nead, and that the law will so apply Nead's credits in this case; that the parties to the account having made no agreement as to the application, the law will make the application for them.

The foregoing statement of the plaintiff's claims constitutes his theory of the case; and he insists that the chattel mortgage authorizing the plaintiff to take possession of the property, as he did, was valid; and that the defendant was, as he claims, a trespasser in interfering with that possession; and his suit is well brought, without any previous demand.

Upon the foregoing theories of the respective parties, the cause was tried and submitted by the court to the jury. The

plaintiff prevailed, and the proceedings and rulings by which the verdict was reached we are asked to review.

It appears from the record that the suit was commenced against Frederick H. Olin and Emmor Ware; but, Ware having died before the issue was made, the defense is continued by Olin, as surviving partner.

Thirty-three errors are assigned. Nead gave the chattel mortgage while in the possession of the property. The mortgage contained a clause authorizing the mortgagee to take possession at any time he deemed himself insecure. The plaintiff took possession under the mortgage, and gave it into the custody of one Clifford to hold for him. Ware & Olin took the property from Clifford by force, and held the possession of the same when it was taken on the writ in this case.

The first four exceptions upon which error is assigned we do not think should be sustained.[1]

The fifth assignment of error is to the admission of the statement of account of property and money advanced to Nead by Ware & Olin to November 1, 1885. . There was some testimony tending to support the plaintiff's theory, and it was properly admitted.

Nead was permitted to testify that, after the delivery of the contract to him, he returned it to Ware to make a copy, but he never returned it. This was the sixth exception. If error, it was harmless.

The seventh assignment is that the court erred in admitting in evidence the following letter:

---

[1] These exceptions were, in substance, as follows:

1. In permitting Nead to state who owned the property at the time the mortgage was given.

2. In not allowing defendant's counsel to cross-examine Nead to show that Ware had knowledge of the ownership of the property, and that Olin did not.

3. In not striking out Nead's answer to the question where he got the ox team,—" Mr. Ware sent it to me from Sand Lake."

4. In permitting Nead to state what arrangements he had with Ware in regard to the purchase of the oxen.

"SAND LAKE, MICH., 1—1—'86.

"E. M. NEAD,—

"*Dear Sir :* We wish you a happy new year.  Mr. Ware will be up there sometime next week, and we have concluded to have you not cut any more green timber at all until we have snow.  You had best keep just what men you can to skid, and let the rest go, until sledding comes; for, if we should not get any more sleighing, the green timber had better be left standing.

"Yours,          WARE & OLIN."

We think this letter has some tendency to show that the writers exercised some influence over Nead as to the manner in which he should proceed with the business under the contract, and is proper, in connection with the plaintiff's other testimony upon the subject of Nead's abandoning the contract.

Nor did the court err in admitting the following letter in evidence:

"SAND LAKE, MICH., 11—4—'85.

"W. E. OVERTON,
      "Big Rapids, M.,—

"*Dear Sir :* We inclose ck. to pay on Nead account to the amount we guaranteed.  You will sell him nothing more on our account.  We had a pretty complete settlement with him yesterday, and he only owes us now about one hundred dollars, so the prospect is fair for him to complete the job, and pay his debts, in our opinion.

"Yours truly.          WARE & OLIN."

This is the subject of the thirteenth assignment, and bears largely upon the state of the account between the parties at the time.  Upon the statement of the claim, as furnished by Ware & Olin, had the whole been paid at the date of this letter, it would be strong evidence to show that the teams had been paid for by Nead, and if they had, under the contract, I think a reasonable construction would be that the title passed to him.  The statement of the claim contains as items the prices paid for these teams.  We find no error in assignments from the seventh to the thirteenth.

The fourteenth is the refusal of the court to withdraw from the consideration of the jury the several statements of account sent by Ware & Olin to Nead, in which the prices paid for the teams were items. For reasons already given, this ruling was correct.

The remaining assignments relate to the exceptions taken on the refusals to charge, and the charge as given. The defendant's counsel asked the court to charge the jury as follows:

"1. Unless you find that defendant's possession of the property in question was wrongful, the plaintiff cannot recover; because no demand was made by or on behalf of plaintiff before suit brought.

"2. Under the circumstances of this case, a demand of defendant by plaintiff for the possession of the property in question must be shown, or plaintiff cannot recover.

"3. To enable you to find for the plaintiff, it must appear that Nead had a right to mortgage the property. If he bought the property of Seaman & Rice and Ware and Olin in the summer of 1885, unconditionally, or if he bought the property of Ware & Olin, or of E. Ware, on condition that the property was not to be his until paid for, and afterwards did pay for it, then he had a right to mortgage it, but not otherwise.

"4. The statement of account rendered by Ware & Olin to Nead, in which these teams are debited to Nead, and the fact that defendant charged Nead with the price of these teams, are not admissions that the property was Nead's, and should not be considered on that question. As a matter of bookkeeping it was proper to charge the teams to Nead, and it could in no way affect the title to the property."

To the ruling refusing to give these requests counsel for defendant excepted.

The second request was properly refused. Before this could be given the court would have to pass upon questions of fact, which was the exclusive province of the jury.

The first might, with great propriety, have been given, although it was not harmful error to refuse it.

The defendant had the right to have the third request

given as requested. I do not find it given in the charge, and it was error to refuse it.

The defendant should have been permitted. the benefit of his fourth request, and the refusal to give it was error. The defendant's theory of the case required this, and it was not without testimony upon which to base it, and I do not find it or the substance of it in the charge.

The following clauses of the charge as given by the court are excepted to, among others, and error is assigned upon them:

"1. It is claimed on the part of Mr. Hood, and testimony has been given tending to show, that these oxen and horses were charged to Mr. Nead in their account that they had with him on his logging contract. This contract in question and the books have been exhibited to you; the court has not seen them; also statements which contain these items charged. Also credits have appeared, it seems to me, and do appear, upon the statements and books of account of Ware & Olin, in which Mr. Nead is credited with labor performed and logs put in, and charged, among other items, with these horses and cattle."

"2. If you should find in this case, gentlemen, that these oxen and horses were charged up on the books of account of Ware & Olin to Mr. Nead, and by applying the rule which the court has stated, taking the credits as they appear, whenever that account is balanced, leaving the oxen and the horses on the one side, together with whatever may have been charged prior to the time they are charged, then give credit for all that has been paid in the way in which it was contemplated, making payments, that is, by putting in logs under this contract; as quick as you find that account was balanced, these horses and oxen were paid for. There is no question but that the weight of authority is in favor of that position.

"3. It is for you to find those facts; the court don't know anything about it. If you should find, after examining into the state of the account, that it was a fact that at any time after these oxen and horses were charged on the books the credits were enough to balance the account, or more than balance it, then the items up to that time are paid for, whether oxen, horses, or anything else. You will

examine into that matter, and ascertain when that state of facts occurred, if ever.

"4. The bare fact, however, that the oxen and horses were charged on the books—that bare fact alone—is not an admission that they were paid for. You will have to find from the books themselves—from the state of the accounts as they have been shown to you—that the credits were sufficient to balance the debit side of the account; that is, up to and including those charges."

"5. Something has been said about the construction of this contract. I don't know that there is anything ambiguous in this contract. If there is any particular clause in this contract that the counsel wish construed, the court will examine it, and give it such construction as he deems it will bear. I will say this, however, that this contract provides how these logs shall be measured; that they should be estimated by the number of shingles, stars and seconds, that they would make, —that is, the shingle logs; and the lumber logs were to be measured by the lumber they would make,—anything better than mill culls. That could not be ascertained until the lumber had been measured; and the other logs, the quantity could not be ascertained until they had b en cut into shingles, and the shingles counted. And you must take the manner in which these gentlemen conducted their business; and if they saw fit to ignore the contract, and settle by any other means, and ascertain by any other way how much they owed Mr. Nead, or how much he had put in,—if they chose to adopt any other rule,—then that would be binding upon them, no matter whether it was in accordance with the terms of the contract or otherwise."

As to the first clause, it assumes what does not appear by the testimony in the record; that Ware opened an account with Nead, relating to their dealings under the contract, and that the account contained a statement of the labor performed and logs put in by Nead, and that the same was in evidence before the jury. No such account kept by Ware & Olin appears in the record, and it was error to allow the jury to make such assumption, and in view of what followed it was clearly prejudicial to the defendant.

The next three clauses may be considered together. In the second the court alludes to the *rule of application* of Nead's

credits, or rather to what he should be credited with, under the contract as stated in the third clause.   There is no statement in the contract in what manner Ware was to be paid for the teams by Nead.   One thing is certain, however, and that is, if Ware did furnish them, the title to the same was to remain in him until he was paid therefor.   Ware was not obliged to take his pay for the teams in Nead's work, unless he chose to, any more than Nead was obliged to pay for the teams in his labor before he could obtain them.   There is no doubt but that Ware furnished the ox team ; and Nead says he (Ware) paid for the horses; and I think, under the undisputed testimony in this case, it should be held that Ware furnished both teams, and that the title was in Ware when they were taken to the camp.

I am equally clear that, upon the undisputed testimony, there was no settlement made between Ware & Olin and Nead under the contract; that the statements made by the parties at the time Nead swears they took place was a mere conclusion as to about how the parties stood, basing the figures entirely upon the estimates made of the logs put in upon his own statement and estimate, before they were cut into timber or shingles, and which were never assented to as correct by either Ware or Olin, and which turned out to be entirely incorrect when the proper amount was ascertained after the logs were cut, and which makes Nead largely their debtor.

It further appears that the account referred to by the court was not a debit and credit account kept by Ware & Olin of the dealings under the contract, but simply a statement of advances made by Ware & Olin during the progress of the work, and which were to be accounted for by Nead when the contract was performed.   It was unquestionably the intention of Nead and Ware both, when they made their contract, that the teams furnished by Ware were to be used on the work, and until the completion of the job; and that if,

when completed, Nead wanted the teams, he could have them by paying for them; and that until that time Nead was to have the use of them, whether upon the jobs or in his private business, but the title was to remain in Ware.

I do not think that the state of the account between the parties to the contract, during the continuance of the work provided for therein, had any effect whatever upon the title to the teams, and that the court erred in so holding.

In the fourth clause, it will be discovered, as well as in the third, the court expressly charges that the title to the property passed to Nead as soon as the balance of the account preponderated in his favor to the amount Ware paid for the teams, regardless of the progress made in the work undertaken, or as to what charges it might be found necessary to make in case Nead failed to perfom his contract, as was claimed he did by Olin.

The fifth clause has this infirmity: It submits to the jury whether another mode than that provided in the contract had not been adopted in the measurement of the lumber and determining the amount of work done by Nead, and a settlement made thereon. This, under the views we have taken, was clearly error.

The other questions raised, and which were ably discussed by counsel, we cannot now consider; but, inasmuch as a new trial is to be had, perhaps we ought to say that we are of opinion that the objection to Nead's testimony upon the ground that it was within the prohibition of section 7545, How. Stat, as amended by the Laws of 1885, p. 156, was not well taken. The case does not come within the provisions of that act.

The judgment must be reversed, and a new trial granted.

CHAMPLIN and MORSE, JJ., concurred. CAMPBELL, J., did not sit.